# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  **LESLIE ORICO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | CIV-17- 322-SPS |
| | ) | |
| 1.  **MCALESTER REGIONAL HEALTH CENTER A/K/A MCALESTER REGIONAL HEALTH CENTER AUTHORITY,** | ) | |
| 2.  **CITY OF MCALESTER,** | ) | |
| 3.  **DAVID KEITH, in his individual and official capacity as CEO of McAlester Regional Health Center,** | ) | |
| 4.  **SCOTT LOWE, in his individual and official capacity as Human Resources Director at McAlester Regional Health Center, and** | ) | |
| 5.  **DAVITA SMART, in her individual and official capacity as a Charge Nurse at McAlester Regional Health Center,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | **ATTORNEY LIEN CLAIMED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Leslie Orico, and for her Complaint against the Defendants alleges and states as follows:

## PARTIES

1. Plaintiff, Leslie Orico is an adult female resident of Atoka County, Oklahoma.

2. Defendants are:

   a. McAlester Regional Health Center a/k/a McAlester Regional Health Center Authority ("MRHC"), a Public Trust conducting business in Pittsburg County, Oklahoma, owned by the City of McAlester;

   b. the City of McAlester ("City"), a governmental entity conducting business in Pittsburg County, Oklahoma;

1

    c.    David Keith, who at all relevant times hereto was the Chief Executive Officer of McAlester Regional Health Center, working in Pittsburg County, Oklahoma;

    d.    Scott Lowe, who at relevant times hereto was the Human Resources Direct at McAlester Regional Health Center, working in Pittsburg County, Oklahoma; and

    e.    Davita Smart, who at all relevant times hereto was a Charge Nurse at McAlester Regional Health Center, working in Pittsburg County, Oklahoma.

## JURISDICTION AND VENUE

3. This is a cause of action arising out of Plaintiff's former employment with Defendant MRHC, which at relevant times was owned by the City, and is based on the following claims: (a) age discrimination, harassment and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"); (b) disability discrimination, failure to accommodate and retaliation in violation of the ADA and ADAAA; (c) violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Laws made actionable by 42 U.S.C. §1983; (d) violation of Plaintiff's Fourteenth Amendment Right to Substantive Due Process made actionable by 42 U.S.C. § 1983; (e) negligent training, retention and/or supervision; (f) tortious interference with a contractual/business relationship (g) tortious interference with prospective economic advantage; and (h) defamation.

4. Jurisdiction over Plaintiff's federal causes of action is vested in this Court under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's corresponding state law claims as they arise out of the same core of operative facts as the federal claims, and jurisdiction over them is vested in this Court under 28 U.S.C. § 1367(a).

5. All of the claims arose in and around Pittsburg County, and the Defendants are/were at all relevant times hereto located, doing business and/or working in such county and may be served in said county. Pittsburg County is located within the Eastern District of

the United States District Court of Oklahoma. Thus, venue is proper in this Court under 28 U.S.C. § 1391(b).

6. Plaintiff has exhausted her administrative remedies as to the above-listed claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 29, 2016. Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated on or about August 22, 2017, which Plaintiff received by mail thereafter, and has timely filed this action within ninety (90) days of receipt of her notice of right to sue.

7. Plaintiff also separately served a tort claim notice on or about December 1, 2016. The Governmental Tort claim was deemed denied after the requisite ninety (90) days. And, this case is timely filed within one-hundred eighty (180) days after the claims were deemed denied.

### STATEMENT OF FACTS

8. Plaintiff (DOB: 2/1973), began her employment with Defendant MRHC on or about January 12, 2016, as a day-shift Emergency Room Registered Nurse. Then-ER Manager Dominic Ikotidem hired Plaintiff.

9. Upon hire, Plaintiff underwent a brief orientation process, after which she was assigned to one of two day-shift ER RN teams.

10. Defendant Smart was the Charge Nurse for the team to which Plaintiff was assigned. Plaintiff reported directly to Defendant Smart.

11. The other RNs working on the same team as Plaintiff (including Lexis Morrison-Brannick, who was in her 20s, Katie Vaughn, who was in her 20s, and Katie Wilkinson, who was in her 30s) were significantly younger than Plaintiff.

12. Before Plaintiff was assigned to Defendant Smart's team, an RN from the other

team asked Plaintiff which team Plaintiff believed Plaintiff would be assigned to.  When Plaintiff said she believed Defendant Smart's team, the other RN sarcastically responded, "good luck!"  Plaintiff asked the RN what she meant to which the RN replied that Defendant Smart's team was mean and did not work well with certain people.

13. Consistent with what Plaintiff was told, once she began reporting to Defendant Smart, she was constantly harassed, nitpicked and ostracized by Defendant Smart and her team.  By contrast, her similarly-situated younger co-workers were not treated in such fashion.

14. By way of example, Defendant Smart asked Plaintiff why she walked the way she did, snidely telling Plaintiff, "you're so prissy when you walk."

15. Defendant Smart also told Plaintiff, "I thought you were going to be a real b*tch when you started and you're not, but I'm still waiting for you to be."  However, at no time did Defendant Smart make such comments to Plaintiff's similarly-situated, younger co-workers.

16. Defendant Smart also refused to train Plaintiff on such matters as how to use the ER computers (which was necessary for Plaintiff to complete patient charting) and where supplies were located.

17. Defendant Smart told Plaintiff that she knew she was supposed to orient Plaintiff, but that she did not have time to do so, leaving Plaintiff to learn such information as best she could on her own.

18. Knowing she did not properly orient Plaintiff, Defendant Smart assigned Plaintiff a heavier patient-load than Plaintiff's younger team members.  This was so despite the fact that Plaintiff's younger team members had been employed longer than Plaintiff, were familiar with the ER computer system, and knew where supplies were located, which would

have allowed them to more easily handle the heavier patient-load.  And, when Plaintiff asked her younger team members for assistance, they hatefully refused to help.

19.	Plaintiff informed Defendant Smart that she did not feel she was sufficiently oriented and that her younger team members were purposefully shunning her.  However, Defendant Smart failed to take appropriate remedial measures.  Rather, Defendant Smart disingenuously told Plaintiff's younger team members that they could not "be mean to the newbie."  And, the treatment to which Plaintiff was subjected worsened thereafter.

20.	Plaintiff's younger team members refused to provide her with information about the patients to which she was assigned and falsely reported to Plaintiff's superiors that Plaintiff engaged in inappropriate conduct, such as yelling at them in front of patients, which resulted in Plaintiff being unjustly written up.

21.	Defendant Smart and the younger team members also repeatedly chastised Plaintiff, unjustly telling Plaintiff that she was slow and that they could work circles around her.  Yet, Defendant Smart and the young team members frequently took breaks in the medicine room, smoking electronic cigarettes (in violation of hospital policy) and sat at the nurses' station texting and looking at social media sites.

22.	Defendant Smart and the young team members also purposefully excluded Plaintiff from conversations and events.  Plaintiff's younger team members frequently made food orders, but did not offer to include Plaintiff.  They also planned a trip, inviting numerous people with whom they worked, including policemen, physicians and firemen, but intentionally excluded Plaintiff.

23.	Plaintiff's younger co-workers also repeatedly made snide remarks, brashly commenting, for example, that Plaintiff was "b*tching" when Plaintiff inquired as to why her younger team members were not cleaning triage rooms.

24.  Defendant Smart and the young team members also sent snap-chat pictures of Plaintiff, referring to Plaintiff as "the b*tch with the clipboard." And, commented "oh my God, she is coming in today and tomorrow," after Plaintiff had been absent for a doctor's appointment.

25.  Plaintiff began reporting the harassment and disparate treatment to Ikotidem beginning in or around early March 2016.

26.  Plaintiff repeatedly asked Ikotidem to reassign her to a different team. However, Ikotidem refused to transfer Plaintiff. And, no remedial action was taken. Rather, Ikotidem unjustly placed blame on Plaintiff.

27.  Thereafter, Defendant Smart and Plaintiff's younger counter-parts chastised Plaintiff for complaining to Ikotidem, threatening that if Plaintiff continued to raise complaints they would make unwarranted complaints about Plaintiff so she would be in trouble.

28.  Plaintiff also overheard Defendant Smart commenting that she hated Plaintiff, that she (Smart) could not stand Plaintiff and that she (Smart) would not allow Plaintiff to get her (Smart) fired. And, in an effort to set Plaintiff up to fail, Defendant Smart often refused to assist Plaintiff with patients, despite Defendant Smart not being busy, but instead talking to other employees or looking at Facebook.

29.  In or around May 2016, Plaintiff spoke with Nurse Manager of Education Julie Powell about transferring to a Nurse Educator position. Powell was receptive, but stated Plaintiff first needed to speak with Chief Nursing Officer Kim Stout.

30.  Upon meeting with Stout, Stout told Plaintiff that she heard Plaintiff was causing problems in the ER. Plaintiff explained this was not true and reported the harassment and disparate treatment she was being subjected to in comparison with her

younger team members.

31. After reporting this to Stout, Powell told Plaintiff that Plaintiff would not be allowed to transfer to a Nurse Educator position, despite the fact that Powell previously told Plaintiff that Powell would love to work with Plaintiff.  As such, Plaintiff was forced to continue working in the hostile environment Defendant Smart and the younger team members created.

32. In or around June 2016, Plaintiff complained to Defendant Lowe about the harassment to which she was being subjected, explaining how Defendant Smart and others treated her in comparison with her similarly-situated younger co-workers, as well as how her young team members shunned and ostracized her.  However, again, no remedial action was taken.

33. Having exhausted all other measures, Plaintiff requested a meeting with Defendant Keith, which took place on or about September 20, 2016.

34. During the meeting, Plaintiff reported the harassment and disparate treatment to which she was subjected, again requesting she be transferred.

35. In response, Defendant Keith asked Plaintiff where she could be transferred, to which Plaintiff stated that she felt comfortable working in any area, except the Med Surg Unit, as she had not received any training in said unit.

36. On or about the following day, Assistant HR Director Tiffany Moore-Roberts told Plaintiff that she was conducting an investigation into Plaintiff's complaints and that Plaintiff would be a "float."  However, Plaintiff was sent as a float to the Med Surg Unit – the one area in which Plaintiff said she was not comfortable working.  And, Plaintiff was only given four hours of orientation in the Med Surg Unit, whereas, a week of orientation is normally provided.

37. Beginning in or around early September 2016, Plaintiff began suffering from severe headaches. Additionally, Plaintiff suffered from diverticulitis, the symptoms of which became exacerbated in or around the same time, i.e., in or around early September 2016.

38. As such, Plaintiff was required to call in sick and go the Emergency Room on or about September 24, 2016, and to seek medical treatment from her physician thereafter, on or about September 27, 2016.

39. During the examination, Plaintiff informed her physician of the treatment to which she was being subjected at work.

40. Plaintiff's physician told her that she was experiencing Post Traumatic Stress Disorder ("PTSD"). Plaintiff's physician ordered that Plaintiff be off work until at least October 3, 2016, but recommended Plaintiff inquire about taking Short-Term Disability.

41. On or about the same day, Plaintiff informed Moore-Roberts that her physician diagnosed her with PTSD, that she was ordered to be off work until at least October 3, and asked about taking Short-Term Disability. However, Plaintiff was not afforded any accommodations. Rather, she was fired just days later on or about September 29, 2016.

42. As a result of her condition, Plaintiff is/was a qualified individual with a disability, in that, she suffers/suffered from impairments (i.e., PTSD and diverticulitis), which substantially limits/limited her ability to perform one or more major life activities, including but not limited to her ability to sleep, eat, think and concentrate.

43. The conditions further impact one or more of her internal bodily processes, including her neurological and digestive systems. However, at all relevant times, Plaintiff was able to perform the essential functions of her job with or without reasonable accommodations. As such, Plaintiff is a qualified individual with a disability, has a record of a disability and/or was regarded as having a disability.

44. On or about September 28, 2016, Moore-Roberts contacted Plaintiff and asked if Plaintiff could be available for a phone conference the next day, to which Plaintiff agreed.

45. On or about September 29, 2016, Plaintiff missed the call, but immediately tried calling back. However, Plaintiff was unable to reach anyone. And, shortly thereafter, Plaintiff received a text message, terminating her employment.

46. Plaintiff subsequently received a letter from Defendant Lowe, alleging that upon investigation, Plaintiff had allegedly refused care to a patient admitted to the ER.

47. MRHC claimed that this and prior write-ups for alleged unprofessionalism and insubordination was the basis for Plaintiff's termination. However, the stated basis for Plaintiff's termination was pretext.

48. At no time did Plaintiff refuse care to any patient. And, Plaintiff was not unprofessional or insubordinate as accused.

49. Moreover, Plaintiff's similarly-situated, younger and non-disabled co-workers actually were unprofessional and insubordinate and did violate other of MRHC's policies without repercussion.

50. Upon information and belief, Defendant Keith and Defendant Smart participated in the decision to terminate Plaintiff, along with Defendant Lowe.

51. Upon information and belief, Defendants Keith, Lowe and Smart have falsely communicated to third parties that Plaintiff refused care to a patient admitted to the ER.

52. As a direct and proximate result of Defendants' actions, Plaintiff has suffered injuries as described below.

## COUNT I: ADEA

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

53.     This Count is asserted against MRHC and the City.

54.     The matters alleged above constitute violations of the ADEA in the form of age discrimination, the creation of a hostile work environment and retaliation.

55.     Plaintiff is entitled to relief under the ADEA because, at all relevant times hereto, Plaintiff was over the age of forty (40); she was qualified for her job; she was discharged, and her job was not eliminated. Plaintiff was also treated less favorably than her similarly-situated, younger (under age 40) counterparts during her employment.

56.     Plaintiff is also entitled to relief under the ADEA for the creation of a hostile work environment based on age, in that, looking at the totality of the circumstances, Plaintiff was subject to harassment which was pervasive or severe enough to alter the terms, conditions or privileges of her employment and the harassment was age-based or stemmed from age-animus.

57.     Plaintiff is also entitled to relief under the ADEA for retaliation because Plaintiff engaged in protected opposition to age discrimination, she suffered adverse actions subsequent to the protected activity, and a causal link exists between the protected activity and the adverse actions taken.

58.     As damages, Plaintiff has suffered lost earnings, past and future, and other equitable and compensatory damages allowed by the Civil Rights Act of 1991. Plaintiff is also entitled to liquidated damages based upon Defendant MHRC's willful conduct in violating the ADEA.

## COUNT II: ADA/ADAAA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

59.     This Count is asserted against MRHC and the City.

60. The matters alleged above constitute discrimination and retaliation based on a disability, a record of a disability and/or perceived disabilities in violation of the ADA and ADAAA.

61. More specifically, Plaintiff was a qualified individual with a disability, in that, she suffers/suffered from a physical impairment (i.e., PTSD and diverticulitis) which substantially limits/limited her ability to perform one or more major life activities as set forth above. Further, Plaintiff's disability impacts one or more of her internal bodily processes, as shown herein.

62. Despite said impairments, Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

63. Defendant MHRC failed to engage in an interactive process to determine reasonable accommodations that could be provided to Plaintiff. And, Defendant MHRC did not provide Plaintiff with any reasonable accommodations.

64. Plaintiff was terminated under circumstances giving rise to an inference of discrimination.

65. As a direct and proximate result of Defendant MHRC's actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

66. Because the actions of Defendant MHRC were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## **COUNT III: Equal Protection**

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

67. This Count goes against all Defendants.

68. The individual Defendants are/were public employees at all relevant times

hereto whose actions were made possible through the use and misuse of their authority as public employees. The individually-named Defendants were acting under the color of their authority in a manner which deprived Plaintiff of her constitutional rights to equal protection. Such Defendants are liable in their individual and official capacities.

69. Plaintiff's Fourteenth Amendment constitutional rights were clearly established at the time of the actions in question. The actions of the Defendants were in deliberate indifference to the constitutional rights of the Plaintiff. Therefore, the individually-named Defendants are liable for the actions taken in violation of such rights in accordance with 42 U.S.C. §1983.

70. The actions listed above have caused a physical, mental and emotion injury to Plaintiff in an amount to be determined by a jury.

71. To the extent that the actions of the Defendants are deemed willful or deliberately indifferent, then punitive damages are available, and should be assessed against each.

### COUNT IV: Substantive Due Process

For her fourth cause of action, Plaintiff incorporates all prior allegations and further allege and state as follows.

72. This Count goes against all Defendants.

73. The individual Defendants were acting under the color of their authority in a manner which deprived Plaintiff of her constitutional right to substantive due process.

74. The matters alleged above were in violation of Plaintiff's Fourteenth Amendment rights to substantive due process which was clearly established at the time of the actions in question. The actions of the Defendants were in deliberate indifference to the constitutional rights of the Plaintiff. Therefore, the individually-named Defendants are liable

for the actions taken in violation of such rights in accordance with 42 U.S.C. §1983.

75. The matters alleged above represent a violation of Plaintiff's rights under the Fourteenth Amendment, *inter alia*, which have caused a physical, mental and emotional injury to Plaintiff in an amount to be determined by the jury.

76. To the extent that the actions of any individual are deemed willful or deliberately indifferent, then punitive damages are available and should be assessed against each such person.

### COUNT V: Tortious Interference

For her fifth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

77. This Count is asserted against Defendants Keith, Lowe and Smart.

78. The acts described above constitute unlawful tortious interference a contractual/employment/business relationship. Defendants' actions were malicious and cause actual harm to Plaintiff's employment relationship with MRHC. Defendants had no justification, privilege or excuse for such interference.

79. As a result, Plaintiff is entitled to all damages allowed by state law.

### COUNT VI: Interference with Prospective Economic Advantage

For her sixth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

80. This Count is asserted against Defendants Keith, Lowe and Smart.

81. The acts described above constitute unlawful interference with a prospective economic advantage.

82. Plaintiff had a reasonable expectation of profit, i.e., continued employment with Defendant MRHC.

83. Defendants Keith, Lowe and Smart had knowledge of this relationship and/or expectancy.

84. Defendants Keith, Lowe and Smart intentionally induced or caused a breach or termination of Plaintiff's relationship or expectancy.

85. Such breach resulted in damage to Plaintiff.

86. As a result, Plaintiff is entitled to all damages allowed by state law.

### COUNT VII: Negligent Supervision, Training and Retention

For her seventh cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

87. This Count is asserted against MRHC and the City.

88. The acts of Defendant MRHC, as described above, constitute the tort of negligent supervision, training and retention.

89. Defendant MRHC had a duty to properly supervise and train its employees to refrain from engaging in unlawful discrimination, harassment and retaliation.

90. Defendant MRHC breached its duty.

91. At the critical time of the tortious incidents described herein, Defendant MRHC knew or should have known employees, including, but not limited to Defendants Keith, Lowe and Smart, would create an undue risk of harm to others.

92. As a direct and proximate cause of Defendant MRCH's negligence, Plaintiff was harmed.

93. As damages, Plaintiff is entitled to all damages allowed by law.

### COUNT VIII: Defamation

For her eighth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows.

94. This Count is asserted against Defendants Keith, Lowe and Smart.

95. The matters alleged above constitute the tort of defamation, in that, upon information and belief, Defendants Keith, Lowe and Smart falsely communicated to third parties that Plaintiff refused care to a patient, which harmed Plaintiff.

96. As a direct and proximate result of Defendants' actions, Plaintiff is entitled to all damages allowed by law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in favor of the Plaintiff and against Defendants and award compensatory damages, back pay, front pay, liquidated damages, punitive damages, together with any appropriate equitable relief, pre- and post-judgment interest, costs and attorney's fees.

**RESPECTFULLY SUBMITTED THIS 24th DAY OF AUGUST, 2017.**

s/ Jana B. Leonard
JANA B. LEONARD, OBA# 17844
SHANNON C. HAUPT, OBA # 18922
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800     (telephone)
(405) 239-3801     (facsimile)
leonardjb@leonardlaw.net
haupts@leonardlaw.net

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED